368 P.2d 749

**Charles Ray BARNARD, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona and William La Follette and Charles Sherrill (Sherrill & La Follette), Respondents.**

**No. 7287.**

Supreme Court of Arizona.

En Banc.

Feb. 15, 1962.

Brandt & Baker, Yuma, for petitioner.

Donald J. Morgan, Phoenix, for The Industrial Commission of Ariz.; James D. Lester, Edward E. Davis, C. E. Singer, Jr., and Lorin G. Shelley, Phoenix, of counsel.

UDALL, Vice Chief Justice.

Certiorari to review an award dated May 26th, 1960, denying compensation to Charles Ray Barnard, petitioner herein. The findings of the respondent Commission were in part as follows:

"9. That said applicant [petitioner] has been able to continue with his work as a supervisor for the insured employer in spite of his pain and suffering on account of the injury and that he has sustained no loss of earning capacity by reason of the disabilities arising from the injury. That he was on a monthly salary as a supervisor and foreman prior to the injury and that he has been able to and is of value to the employer to the extent of the same amount of salary which he has earned continuously since released to do work after injury.

"10. That in determining that applicant has no reduced monthly earning capacity as a result of his injury by accident, this Commission has given full consideration to each of the matters set forth in A.R.S. § 23–1044 D, 1956, and full consideration to all other facts and circumstances pertaining to the case."

Accordingly, the award made was limited to $204.69 representing "compensation for total disability from March 29, 1959 through April 19, 1959 * * *."

Petitioner had been employed in Yuma County, Arizona by Sherrill & La Follette, hereinafter referred to as the employers, for approximately eight years prior to the injury. He worked as a supervisor in charge of surveying, land-leveling, ditch maintenance and repairs and irrigation for some six to eight thousand acres of land.

Prior to his accident petitioner worked seven days a week and approximately nine hours a day for his employers. For this he received a salary of $400 per month, a four-room dwelling with all utilities furnished as well as gas, oil and repairs for his automobile.

While in the course of his employment a car in which petitioner was riding was involved in a collision whereby petitioner received whiplash injuries to his neck and back. The accident caused permanent injury, i. e., inflammation of the nerve route (radiculitius) at the C–8 level of the spine. This in turn aggravated an old arthritic condition. As a result petitioner sustained a restriction in the range of motion of the neck, and now experiences difficulty in looking from side to side. He also complains of intermediate aching of the neck and head and diminution in sensation or feeling in the middle left finger.

Based upon the injuries thus sustained the medical advisory board recommended a 15% permanent partial disability. The Commission found that said applicant had

suffered a 15% general physical functional disability as a result of said injury.

The record shows the injuries affected petitioner's work in that whereas he previously worked nine hours a day, his working day was cut to four or five hours after the accident and his efficiency was impaired. The foreman of the ranch and one of the employers estimated there was a 50% decrease in petitioner's efficiency after the accident.

Upon being discharged from the hospital petitioner was returned to his employment at the same wage that he received prior to the accident. Employer Sherrill testified that petitioner was kept on the job at the same salary up to the time of the hearing because of his long employment with the company and because of the fact that petitioner was his (Sherrill's) uncle.

After the Commission had made its award, holding that since petitioner had been continued at the same salary his services were of equal value to his employer after the accident as before and hence no loss of earning capacity was involved, a motion for a rehearing was timely filed and a hearing conducted on the 10th day of December 1960. On the 3rd day of March, 1961, the Commission affirmed its prior award.

The petitioner contends that the Commission acted without jurisdiction in its findings and award, and that the findings and award are not supported by the evidence.

In refutation of petitioner's position the Commission claims (1) that when an employee returns to his former work under the same contract of hire and performs labor of a value to the employer equal to the wages which he previously received he has suffered no loss of earning power, and (2) that the "gratuity" in after-injury wage payments was not proven by a preponderance of the evidence. Petitioner spent about 25% of his time in the performance of engineering work. He took a $100 per month cut in wages for a period of time a year or more before the accident because there was no engineering work to be done.[1]

Employer Sherrill testified that the surveying phase of the work performed by the petitioner was approximately eight days out of each month, or about 27% of the time, and that the latter had to be constantly on the job to take care of breaks in the ditches which usually occurred at the rate of one or two per day.

---

1. "Well, I took $100 a month cut over a three-month period there.
   Q. "When was this?
   A. "I don't remember which year it was.
   * * * * *

Q. "A year or so before the accident?
A. "Yes, sir.
Q. "And the reason for that was what?
A. "Well, they didn't have any engineering work going on at that time."

It is claimed by the Commission that the post-injury earnings of the petitioner, evaluated in the light of all the circumstances, indicated that the petitioner's services were worth $50 per day. The record however does not bear out this contention. The testimony in regard to this figure of $50 per day is as follows.[2] It is thus the opinion of the employer that a registered engineer would do the work that had been performed by petitioner in ten percent of his time or less, whereas the same work performed by the petitioner required about 27% of his time.

Throwing further light on this question the petitioner testified that he had never been paid $50 a day for his services and that if such a figure was suggested it was his opinion it would not only cover the services of an engineer but a crew of three as well.[3]

It can readily be seen that the services of this 62-year-old engineer were never considered, either by himself or his employers, to be a major factor in his employment, and in view of the mixed and varied nature of his work it would have been almost impossible to state exactly how much time in each day was devoted to each phase of his employment. Furthermore there is no evidence that the employers needed the services of petitioner as an engineer a greater portion of the time after the accident than they did before the accident. The petitioner, for a period of approximately eight years, had been paid $400 per month plus other considerations for his combined efforts including his engineering skills. It may be assumed therefore that his services as an engineer were of no greater value to the employers than the amount they paid him.

The Commission by its findings Nos. 9 and 10 states that it has given "full consideration" to each of the matters referred to in A.R.S. § 23-1044, subd. D. This section in part reads as follows:

"In determining the amount which represents the reduced monthly earning capacity for the purposes of subsection C of this section, consideration shall be given among other things, to any pre-

2. Q. "And in addition to that what would you have to pay for engineering work?
   A. "Well, he spends a lot more time at the engineering angle than he would if he was coming down to Phoenix as a registered engineer. He is a salaried employee rather than an hourly. He is justified in spending a lot more time and without closer supervision. Normally, if I was hiring an engineer, $50 per day or some such figure, it wouldn't represent probably 10% of his time, or less."

3. Q. "What is the figure $50 based upon then?
   A. "Well, I figure that is what a modern engineering crew would cost.
   Q. "The whole crew?
   A. "Yes, sir.
   Q. "How many people are involved in that $50 per day?
   A. "I would say three.
   Q. "Three employees?
   A. "That is just an estimate; I don't know."

vious disability, the occupational history of the injured employee, *the nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to the injury* \* \* \*." (Emphasis supplied.)

In its award entered on the 3rd day of March 1961, affirming its previous findings and award, the Commission made findings which read in part as follows:

"1. That this Commission finds that exclusive of the engineering and professional work performed, applicant is doing work which would be worth an amount equal to $300.00 per month; that in addition to such work he is doing engineering work which is the principal value to the employer and that such professional work is worth at least $100.00 per month."

It is apparent from the record that the Commission has *not* given "full consideration to each of the matters set forth in A.R.S. § 23–1044 D, 1956, and full consideration to all other facts and circumstances pertaining to the case." No reference is made to the $20 item included in the average monthly wage designated as $420 in their findings of fact dated May 26, 1960. This $20 item probably refers to the amount paid for utilities by the employers for the benefit of the petitioner each month. The testimony of Employer Sherrill on this point reads:

Q. "But from your knowledge of the area, then the market value would be $40 to $50, is that right?

A. "Well, I would say that the cash outgo would be $20 for utilities alone; I'm assuming that the house for that area would rent for $20 to $30."

Nor was consideration given to the value to petitioner of occupying a four-room house at Tacna. Mr. Sherrill, after having his memory refreshed on values pertaining to rentals in that area, testified:

Q. "And Sherrill-La Follette paid for his rent in Tacna, did they?

A. "Yes.

Q. "How much did you pay per month?

A. "I don't recall.

Q. "[Would] the figure of $60 a month refresh your recollection of it?

A. "Well, I'm sure it was in that neighborhood but I wouldn't swear that $60 was the correct amount.

Q. "Well, let's put it this way: was it under $50?

A. "No, I'm sure it was over $50.

Q. "At least $50 a month then was paid by Sherrill & La Follette for housing Mr. Barnard in Tacna?

A. "Right."

The Commission likewise failed to give consideration to the uncontradicted testimony

that the petitioner received $30 per month expense money from the employers for the use of his truck.[4]

The same contract of hire that was in effect before the accident continued afterward.[5] This would mean that petitioner is still using his truck for transportation after the accident, but the findings do not show that he has received $30 per month or any other sum for the expense of operating his machine. While it is possible that with petitioner's curtailed activities his truck expense would not have been as great after the accident as before, nonetheless it is an item that should have been given consideration.

Post-injury earnings are not the only factor to be considered in determining whether there is a reduction in earning capacity:

"Also to be taken into consideration is whether the post-injury earnings are a proper index of the employee's earning capacity or whether the amount of such earnings truly reflects other considerations which may exaggerate such capacity and be only of a temporary nature. Thus, in 2 Larson, Workmen's

Compensation, § 57.34 (1952), it is stated:

'Wages paid an injured employee out of sympathy, or in consideration of his long service with the employer, clearly do not reflect his actual earning capacity, and, for purposes of determining permanent disability are to be discounted accordingly.'" Allen v. Industrial Commission, 87 Ariz. 56, 65, 347 P.2d 710, 716 (1959).

The rule of law expressed on this point in Allen v. Industrial Commission, supra, has been applied and recognized in other Arizona cases. See, e. g., Wammack v. Industrial Commission, 83 Ariz. 321, 320 P.2d 950 (1958). Arizona is in accord with the majority of states throughout the country in regard to the effect of post-injury earnings. The law regarding this is summarized in 149 A.L.R. at pages 438–39 as follows:

"It is generally held that an injured employee should not be denied compensation because he is paid as much or more after the injury, where it is shown that such payment is influenced by the sympathy of the employer for the in-

---

4. Q. "And they paid the expense of your truck that you used on the ranch or in connection with the ranch business?
   A. "Yes.
   Q. "You wouldn't get any extra money on account of that, would you?
   A. "I get $30 a month.
   Q. "For what?

A. "For use of the truck but I had to pay part of that out in repairs. That was for greasing, repairing, servicing."

5. Q. "Has there been any change in his contract of hire since the accident?
   A. "No."

jured employee, or is in recognition of long services or special merits of the employee. The theory behind this holding is that wages of this kind paid to the employee are not really earned by him, since his services are not worth as much in the open labor market, but constitute, partly at least, a mere gratuity."

We therefore hold that the award of the Commission denying compensation to petitioner is not supported by competent evidence.

The award of the Commission is set aside.

BERNSTEIN, C. J., and STRUCKMEYER, JENNINGS and LOCKWOOD, JJ., concur.