IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**TIMOTHY MATTHEWS,**
*Petitioner Employee,*

*v.*

**THE INDUSTRIAL COMMISSION OF ARIZONA,**
*Respondent,*

**CITY OF TUCSON,**
*Respondent Employer,*

**TRISTAR RISK MANAGEMENT,**
*Respondent Insurer.*

———————

No. CV-21-0192-PR
Filed November 23, 2022

———————

Special Action - Industrial Commission
ICA Claim No. 20182-540202
Insurer No. 18736339
The Honorable Gary M. Israel, Administrative Law Judge
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
251 Ariz. 561 (App. 2021)
**AFFIRMED IN PART and VACATED IN PART**

———————

COUNSEL:

Laura Clymer (argued), Brian Clymer, Brian Clymer Attorney at Law, Tucson, Attorneys for Timothy Matthews

M. Ted Moeller (argued), Karolyn F. Keller, Moeller Law Office, Tucson, Attorneys for City of Tucson and Tristar Risk Management

Robert J. Forman, Dix & Forman, PC, Tucson, Attorneys for Amicus Curiae Arizona Association of Lawyers of Injured Workers

Kristin M. Mackin, William J. Sims III, Sims Mackin, Ltd. Phoenix, Attorneys for Amici Arizona Municipal Risk Retention Pool and Arizona Counties Insurance Pool

_____

JUSTICE BOLICK authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES LOPEZ, BEENE, MONTGOMERY, and KING joined. VICE CHIEF JUSTICE TIMMER concurred in part and dissented in part.

_____

JUSTICE BOLICK, Opinion of the Court:

¶1        In this case, we hold that A.R.S. § 23-1043.01(B), which limits workers' compensation claims for mental illnesses to those that arise from an "unexpected, unusual or extraordinary stress" situation, does not violate article 18, section 8 of the Arizona Constitution or the equal protection guarantee of article 2, section 13.

## BACKGROUND

¶2        Timothy Matthews began training with the Tucson Police Department ("TPD") in August 2000 after passing the necessary pre-employment physical and psychological examinations. Matthews participated in TPD's training program for four months.

¶3        After a four-month training program, Matthews worked as a TPD patrol officer. In 2009 while off duty, Matthews passed by an accident involving a car that hit a police officer on a bicycle. Matthews responded to the scene. He later learned the officer had died. Afterward, Matthews told his supervisor that the incident was negatively affecting him. He was subsequently sent to a psychiatrist, but the incident was never reported as an industrial accident for workers' compensation purposes.

¶4        In 2011, Matthews was promoted to detective. He worked in the violent crimes section for six years and then in the street crimes unit. In

March 2018, Matthews transferred to the domestic violence unit. During these years, Matthews continued to receive professional mental health care.

¶5            In June 2018, Matthews responded to an active domestic violence scene where an armed suspect was barricaded with his ex-wife and stepson in a residential garage. While negotiators spoke with the armed suspect, Matthews watched a live stream of the residence from a block away. Eventually, the armed suspect released his ex-wife and stepson but remained inside the garage.

¶6            Matthews obtained a search warrant for the SWAT team to remove the suspect. Matthews also interviewed the ex-wife and stepson. At some point, gunshots were heard from inside the garage. The sound prompted officers stationed around the home to partially breach the garage door. The suspect, visibly bleeding from a self-inflicted chest wound, then attempted to crawl out of the garage with his hand raised. The responding officers pulled him out of the garage and administered first aid, but the suspect died at the scene. Matthews watched this unfold on the live stream. He was later assigned to inspect the suspect's body and photograph the crime scene.

¶7            After this incident, Matthews began having nightmares, flashbacks, and difficulties concentrating on the job. Matthews reported these issues to his captain. Additionally, Matthews sought care from his treating psychiatrist and the City of Tucson's doctor. Both physicians recommended Matthews be relieved from his work duties.

¶8            Matthews filed an industrial injury claim arising from the June 2018 incident, claiming that it exacerbated his preexisting post-traumatic stress disorder ("PTSD"). Tristar Risk Management, the City of Tucson's insurer, denied Matthews' claim. Matthews protested the denial, and a three-day hearing was held before an administrative law judge ("ALJ").

¶9            Matthews testified that the June 2018 incident was the most recent of several incidents on the job that contributed to his PTSD. However, he claimed the June 2018 incident was the "straw that broke the camel's back." Matthews also presented Sergeant Daniel Spencer, his TPD training supervisor, as an expert witness. Spencer testified that a domestic violence barricade situation resulting in suicide happens about two to four

times a year.  Additionally, Spencer testified that there were more than 100 officers in the area during the incident and that Matthews' only unique involvement was inspecting the suspect's deceased body.  Otherwise, Spencer characterized the incident as a "standard issue."

¶10        The City of Tucson and Tristar (the "City") presented a former Phoenix police officer and Dallas police chief, Benny Click.  During Click's testimony, he expressed that the June 2018 incident was not unusual for a law enforcement officer and that stress is an expected part of the job. Click further testified that even incidents like a fellow officer being shot or mass shootings are anticipated incidents.

¶11        In October 2019, the ALJ issued a decision finding Matthews' claims for mental injuries non-compensable because the June 2018 incident was not an "unexpected, unusual or extraordinary stress" situation as required under § 23-1043.01(B).  The ALJ did not consider Matthews' testimony on the prior alleged PTSD-inducing incidents because he never filed a gradual injury claim.  Matthews requested agency review, arguing that § 23-1043.01(B) violates article 18, section 8 of the Arizona Constitution because it allows defendants to use an assumption of risk defense against applicants.  The ALJ affirmed the initial decision.

¶12        Matthews next filed a statutory special action petition with the court of appeals.  At oral argument, Matthews argued that § 23-1043.01(B) was unconstitutional under article 18, section 8 because the original Workers' Compensation Act ("WCA") encompassed mental injuries, and thus the legislature was restricted from treating them differently than physical injuries.[1]

¶13        In a divided opinion, the court of appeals affirmed the denial of benefits.  *Matthews v. Indus. Comm'n*, 251 Ariz. 561, 563 ¶ 1 (App. 2021). The majority held that § 23-1043.01(B) did not unconstitutionally restrict compensation but instead expanded it because the framers of the Arizona Constitution never contemplated mental injuries when they used the term "injury."  *Id.* at 569–70 ¶ 19.

¶14        The dissent argued that "injury" should be read more broadly and in the context of article 18, section 8's language, of any accident arising

---

[1] In 1912 the WCA was originally titled the Workman's Compulsory Compensation Act.  1912 Ariz. Sess. Laws ch. 14 (Spec. Sess.).

out of and in the course of employment. *Id.* at 344 ¶ 30 (Eckerstrom, J., dissenting). The dissent construed "accident" in the workers' compensation context to encompass both unexpected workplace events and injuries arising from the workplace. *Id.* Therefore, the dissent concluded that by subjecting compensation for such injuries and accidents to additional requirements, § 23-1043.01(B) unconstitutionally barred Matthews from the benefits to which he is entitled under the WCA. *Id.* at 345 ¶ 33.

¶15 We granted review to consider whether § 23-1043.01(B) is unconstitutional as applied to claimants who work in high-stress occupations such as law enforcement. This issue is a matter of statewide concern. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶16 A challenge to a statute's constitutionality presents a question of law, which we review de novo. *State v. Hansen*, 215 Ariz. 287, 289 ¶ 6 (2007).

I. ARTICLE 18, SECTION 8 OF THE ARIZONA CONSTITUTION

A.

¶17 Article 18, section 8 provides in relevant part:

The legislature shall enact a workmen's compensation law applicable to workmen engaged in manual or mechanical labor in all public employment whether of the state, or any political subdivision or municipality thereof as may be defined by law and in such private employments as the legislature may prescribe by which compensation shall be required to be paid to any such workman, in case of his injury and to his dependents, as defined by law, in case of his death, by his employer, if in the course of such employment personal injury to or death of any such workman from any accident arising out of and in the course of, such employment, is caused in whole, or in part, or is contributed to, by a necessary risk or danger of such employment, or a necessary risk or danger inherent in the nature thereof, or by failure of such

5

employer, or any of his or its agents or employee or employees to exercise due care, or to comply with any law affecting such employment . . . .

**¶18** The controlling language from the constitutional provision is coverage for an "injury . . . from any accident" arising from "a necessary risk or danger" of the employment. Ariz. Const. art. 18, § 8. Matthews argues that by requiring workers' compensation claimants to prove their mental injuries were caused by "unexpected, unusual or extraordinary stress," § 23-1043.01(B) unconstitutionally restricts legal causation by creating an assumption of the risk defense.

**¶19** In deciding this question, we must first determine whether article 18, section 8 of the Arizona Constitution encompasses mental stress injuries; that is, mental illnesses brought on not by physical trauma but by mental trauma such as stress or shock. *See Tucson Unified Sch. Dist. v. Indus. Comm'n*, 198 Ariz. 133, 134 ¶ 7 (App. 2000). If it does not, as the court of appeals majority concluded, then the statute does not violate article 18, section 8 because the legislature is free to enlarge the scope of workers' compensation. *Goodyear Aircraft Corp. v. Indus. Comm'n*, 62 Ariz. 398, 408 (1945) ("Sec. 8 of article 18 . . . is not a grant of power to the legislature, but a command directing it to exercise a power which it already possessed. The constitutional mandate does not restrict the legislature in its inherent powers to go beyond the terms of the Constitution in making injuries from accidents, which are not mentioned therein, compensable."). If the constitutional provision does encompass mental stress injuries, as the dissent concluded, we must then determine whether the statute adds impermissible obstacles to workers' compensation. *See Grammatico v. Indus. Comm'n,* 211 Ariz. 67, 75 ¶ 35 (2005) (striking down a different part of the statute because it expanded the constitution's proof requirements). Although this Court has frequently construed both the constitutional provision and § 23-1043.01, we have never determined whether article 18, section 8 provides workers' compensation for mental stress injuries. *See, e.g.*, *France v. Indus. Comm'n*, 250 Ariz. 487, 488 ¶ 2 n.1 (2021).

**¶20** Our relevant case law is circuitous and contradictory and does not resolve this question. In *Pierce v. Phelps Dodge Corp.*, 42 Ariz. 436 (1933), this Court rejected a claim for death from acute myocarditis that was accelerated by work conditions, holding that the term "accident" in the constitutional provision meant an unexpected event that caused an injury. *Id.* at 446–47. This view was rejected in *Paulley v. Indus. Comm'n*, 91 Ariz.

266 (1962), which held that "injury by accident" occurs "when either the external cause or the resulting injury itself is unexpected or accidental." *Id.* at 272. Neither *Paulley* nor the cases following *Pierce* on which it relied involved mental stress injuries.

¶21 In *Brock v. Indus. Comm'n*, 15 Ariz. App. 95 (1971), the workers' compensation claimant was a truck driver who previously suffered from depression, which was aggravated by an incident in which he ran over and killed a woman, did not realize he had done so until informed by the police, and was subsequently suspended and investigated. *Id.* at 95–96. The court of appeals held that "the presence of a physical force or exertion [is] not a necessary element to the determination that the claimant had been 'injured by accident,'" and that "it is now commonly viewed to include any unexpected injury-causing event, so long as it is work-connected." *Id.* at 96.

¶22 The next year, the court of appeals held that where anxiety neurosis was caused not by an "unexpected injury-causing event but rather a buildup of emotional stress for a period of years," it was not compensable because it was "part of the usual, ordinary and expected incidents of his employment." *Shope v. Indus. Comm'n*, 17 Ariz. App. 23, 25 (1972).

¶23 In *Fireman's Fund Ins. Co. v. Indus. Comm'n*, 119 Ariz. 51 (1978), this Court held that a claim for a mental breakdown that resulted from steadily increased work responsibility was compensable. *Id.* at 54–55. The Court reasoned that "[p]hysical impact or exertion is not a necessary element in determining whether an injury has, in fact, occurred," *id.* at 54, and that "by definition, an injury is caused by accident when the resulting injury is unexpected." *Id.* at 53.

¶24 Justice Gordon dissented, emphasizing that "the Act was not intended to be a general health and accident insurance substitute." *Id.* at 55 (Gordon, J., dissenting) (citing *Cavness v. Indus. Comm'n*, 74 Ariz. 27 (1952)). He declared that an "award for a mental condition brought about by the gradual build-up of emotional stress over a period of time, without an injury-causing event, paves the way for tomorrow's abuses of the workmen's compensation system." *Id.* He called on the Court to adhere to "the concrete standard established by *Shope*," and urged that "this is a step which should be taken by the Legislature, rather than by further judicial modification" of injury-by-accident. *Id.*

7

**¶25**        A few months later, the Court again took up compensation for a disability brought about by emotional stress. *Sloss v. Indus. Comm'n*, 121 Ariz. 10 (1978). Noting *Fireman's Fund* held that physical force was not necessary to establish injury, the Court nonetheless held that to "qualify as an injury by accident, the condition must have been produced by the unexpected, the unusual, or the extraordinary stress." *Id.* at 11.

**¶26**        The year after *Sloss*, the legislature enacted § 23-1043.01. At issue here is subsection B, providing as follows:

> A mental injury, illness or condition shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this chapter unless some unexpected, unusual or extraordinary stress related to the employment or some physical injury related to the employment was a substantial contributing cause of the mental injury, illness or condition.

§ 23-1043.01(B). This language essentially codified the holding in *Sloss*.

**¶27**        In *Grammatico*, ¶ 19, the Court concluded that A.R.S. § 23-1021(D), which required proof that the presence of alcohol or illegal drugs was not a contributing cause of an accident to qualify for workers' compensation, violated article 18, section 8. *Grammatico*, 211 Ariz. at 75 ¶ 35. The Court reasoned that although the constitutional provision does not limit the legislature's power to define medical causation, that is, whether the accident caused the injury, the legislature may not alter legal causation as defined by article 18, section 8. *Id.* at 72 ¶¶ 20–21. Because the constitutional provision provides compensation where a necessary risk of employment contributed to the industrial accident (legal causation), requiring claimants to prove drugs and alcohol were not a factor rendered the provision unconstitutional. *Id.* at ¶ 23. Matthews invokes *Grammatico* to argue that subsection B likewise alters the constitutional definition of legal causation because it adds the requirement that the injury-causing accident must be "unexpected, unusual or extraordinary."[2]

---

[2] "Legal causation concerns whether the injury arose out of and in the course of the employment on the other hand, medical causation ordinarily requires expert medical testimony to establish that the industrial accident caused the injury." *DeSchaaf v. Indus. Comm'n*, 141 Ariz. 318, 320 (App. 1984). (internal citation omitted).

¶28  Most recently, in *France*, we held that a deputy who developed PTSD after he shot and killed a man who threatened him with a shotgun during a welfare check was entitled to compensation under § 23-1043.01(B) because the precipitating event was "unexpected, unusual or extraordinary." *France*, 250 Ariz. at 488 ¶ 1. Because we concluded that the illness was compensable under the statute, we did not address the statute's constitutionality. *Id.* at n.1. That is the question now before us.

B.

¶29  Given the constitutional authority vested in the legislative branch, we do not lightly overturn statutes. *See* Ariz. Const. art. 4, pt. 1, § 1; *see also* Ariz. Const. art. 18, § 8 ("The legislature shall enact a workmen's compensation law applicable to workmen engaged in manual or mechanical labor in all public employment . . . ."); *State v. Hulsey*, 243 Ariz. 367, 386 ¶ 73 (2018); *San Carlos Apache Tribe v. Superior Court*, 193 Ariz. 195, 204 ¶ 11 (1999). When construing a constitutional provision, we seek to give terms the original public meaning understood by those who used and approved them. *See, e.g.*, *State ex rel. Brnovich v. City of Phoenix*, 249 Ariz. 239, 244 ¶ 21 (2020) ("[W]e give the words their ordinary meaning, unless the context suggests a different one."); *Golder v. Dep't of Revenue*, 123 Ariz. 260, 265 (1979) ("The intent of the Legislature can only be determined by the language used, aided by the canons and rules of construction founded upon reason and experience." (quoting *Barlow v. Jones*, 37 Ariz. 396, 399 (1930))); *District of Columbia v. Heller*, 554 U.S. 570, 576–77 (2008).

¶30  The Court has not examined the original public meaning of the key terms in article 18, section 8 for nearly a century. *See Pierce*, 42 Ariz. at 446. Thus, to determine whether the legislature permissibly expanded or improperly contracted workers' compensation eligibility in § 23-1043.01(B), we must ascertain the original public meaning of the key terms used in article 18, section 8.

¶31  Matthews focuses on the constitutional provision's words, "necessary risk or danger of such employment." By adding the statutory modifier "unexpected, unusual or extraordinary," Matthews argues, the legislature unconstitutionally constrained the types of risks that could trigger workers' compensation eligibility. The court of appeals' dissent likewise urges that "the criteria for sorting compensable mental injury claims from non-compensable ones cannot constitutionally exclude claims

that arise from predictable hazards of the workplace." *Matthews*, 251 Ariz. at 572–73 ¶ 32 (Eckerstrom, J., dissenting).

¶32 But that begs the question: what claims are encompassed by article 18, section 8? All agree that an injury by accident is the predicate for coverage. If the definition of those terms when our constitution was adopted in 1912 did not encompass mental stress injuries, then such coverage exists only to the extent it has subsequently been made available by the legislature. *See Atkinson, Kier Bros., Spicer Co. v. Indus. Comm'n*, 35 Ariz. 48, 52–53 (1929) (upholding the legislature's action to provide coverage beyond "workmen engaged in manual or mechanical labor," as originally provided in article 18, section 8).

¶33 Our examination of original public meaning starts with dictionary definitions from the time the provision was adopted. *See, e.g.*, *Burns v. Ariz. Pub. Serv. Co.*, 517 P.3d 624, 630 ¶ 25 (Ariz. 2022). Our work also can be aided by corpus linguistics, which employs a massive database that enables date-specific searches for the possible, common, and most common uses of words or phrases as they were used in newspapers, books, magazines, and other popular publications. Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 831–32 (2018). Many courts have employed corpus linguistics in similar contexts to determine the ordinary meaning of terms when they were put into statutory or constitutional use. *See, e.g.*, *Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682–83 (6th Cir. 2022) (using corpus linguistics to determine the meaning of "reckless driving"); *United States v. Rice,* 36 F.4th 578, 583 n.6 (4th Cir. 2022) (using corpus linguistics to assess whether strangulation requires intent); *In re Estate of Heater*, 498 P.3d 883, 890 ¶ 35 (Utah 2021) (applying corpus linguistics to define "natural parent"); *Bright v. Sorensen,* 463 P.3d 626, 638–39 ¶¶ 56–57 (Utah 2020) ("foreign object"); *Richards v. Cox*, 450 P.3d 1074, 1079–80 ¶¶ 19–25 (Utah 2019) ("employment in"); *State v. Lantis,* 447 P.3d 875, 880–81 (Idaho 2019) ("disturbing the peace"); *People v. Harris*, 885 N.W.2d 832, 839 (Mich. 2016) ("information").

¶34 In some past cases the Court has embraced the general rule that "because constitutions are for the purpose of laying down broad general principles, and not the expression of minute details of law, their terms are to be construed liberally, for the purpose of giving effect to the general meaning and spirit of the instrument, rather than as limited by technical rules of grammar." *State ex rel. La Prade v. Cox*, 43 Ariz. 174, 177–78 (1934). With due respect to our judicial forebears, we are neither

authorized nor competent to discern the "spirit" of a constitutional provision nor to effectuate what we divine in that regard. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 344 (2012) ("[T]he 'spirit' of laws is the unhappy interpretive conception of a supposedly better policy than can be found in the words of an authoritative text. It is an unreliable nonstandard."). Rather, we apply the constitution's plain meaning. *See, e.g.*, *Golder*, 123 Ariz. at 265. Moreover, while terms such as "due process of law" and "equal protection of the laws" are indeed general, the constitutional language here exhibits far greater specificity, commanding coverage only for (1) an injury (2) occurring by accident (3) that is a necessary risk or danger of employment. Ariz. Const. art. 18, § 8. Because of that triple qualifier, it has aptly been observed that workers' compensation is not general insurance coverage but only covers the instances specified in the constitution or by the legislature. *Cavness*, 74 Ariz. at 30. Only the legislature or the people acting in their legislative capacity may expand those terms, not the courts.

¶35 Turning to the actual language, the dissent effectively takes the unsupported position that a *possible* meaning within the dictionary definition is sufficient to infuse a constitutional or statutory provision with that meaning. *Infra* ¶ 57. To the contrary, "we give the words their ordinary meaning, unless the context suggests a different one." *State ex rel. Brnovich*, 249 Ariz. at 244 ¶ 21. Corpus linguistics is useful in assessing whether a possible meaning was a common one when the words were adopted in law, such that we can assume that the legislature or electorate understood a term to encompass that particular meaning.

¶36 An authoritative dictionary published at the time our constitution was adopted defines "injury" as "that which occasions harm morally or physically; detriment; loss; damage." *Injury*, New Websterian Dictionary (1912). That definition reflects its common usage at the time. A corpus linguistics review of the term reveals that "injury" connotes physical, reputational, community (e.g., a person has "done the city a greater injury than any man who ever lived in Westville"), or property harm. Search of "Injury" from 1912, Corpus of Hist. Am. Eng., https://www.english-corpora.org/coha/ (last visited Nov. 14, 2022) (populating 60 source references). These popular usages contained no references to any type of illness or mental harm. Together, these sources indicate that stress-related illness would not have been considered an "injury" when the constitutional provision was adopted.

¶**37**        Similarly, in 1912, "accident" was defined as "an event which is unexpected, or the cause of which was unforeseen; a contingency, casualty, or mishap; a property of a thing which is not essential to it." *Accident*, New Websterian Dictionary (1912).  References in popular culture depicted an accident as a solitary, unexpected event; a diversion from the ordinary course of events. Search of "Accident" from 1912, Corpus of Hist. Am. Eng., https://www.english-corpora.org/coha/ (last visited Nov. 14, 2022) (populating 89 source references).    The term was frequently juxtaposed against sickness or illness (that is, "accident or sickness," "accident or illness").  *Id.*  Thus, in 1912, the plain meaning of an injury by accident would be physical damage caused by a singular, unexpected event.

¶**38**        Importantly, *none* of the common uses identified through corpus linguistics encompass the meaning the dissent attaches to accident by injury: a traumatic event or series of events, whether anticipated in the scope of employment or not, that cause or exacerbate a serious mental stress illness.

¶**39**        The dissent contends that in searching for the original public meaning of injury by accident, we should not be looking at 1912, when article 18, section 8 was adopted, but at 1925, when the voters ratified significant changes.  *Infra* ¶ 63.  That year, as the dissent observes, the legislature and the voters amended the provision to create an industrial commission, establish a state compensation fund, include death benefits, and expand coverage to workers in non-dangerous occupations.  *Infra* ¶ 63.

¶**40**        What the amendments did *not* do is alter in any way the injury by accident language.  When a subsequent enactment imports unchanged earlier language, it imports the original meaning as well.  *See* Scalia & Garner, *supra*, at 323 ("[W]hen a statute uses the very same terminology as an earlier statute [,] especially in the very same field[,] . . . it is reasonable to believe that the terminology bears a consistent meaning.  One might even say that the body of law of which a statute forms a part—especially if that body has been codified—is part of the statute's context.").

¶**41**        Regardless, the temporal focus urged by the dissent appears to make no difference.  The dissent posits that between 1912 and 1925, the experience of World War I surely must have broadened the understanding of "accident" and "injury" to encompass trauma-induced mental stress

injuries such as shell shock. *Infra* ¶ 65. But neither the dictionary definitions nor common usage of those terms changed. *See Accident,* Baldwin's Century Edition of Bouvier's Law Dictionary (1926) ("An event which, under the circumstances, is unusual and unexpected by the person to whom it happens"); *Accident*, Collegiate Law Dictionary (1925) ("An event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected"); *see Injury*, Webster's New Modern English Dictionary (1922) (defining injury as "injuries that which occasions harm morally or physically; detriment; loss; damage"). These definitions, consistent with the 1912 version, contemplate "accident" as a singular, unforeseeable event or effect; and "injury" as encompassing specific types of harm that did not include trauma-induced stress injuries. Such injuries were certainly known following World War I, but perhaps were more likely thought of as illness, disease, or condition. *See, e.g., Illness,* Baldwin's Century Edition of Bouvier's Law Dictionary (1926) (defining illness in the insurance context as "a disease or ailment of such a character as to affect the general soundness, and healthfulness of the system."). But article 18, section 8 uses the terms "injury" and "accident," not "illness," "disease," or "condition."

**¶42** Nor did the idea of trauma-induced mental stress injuries enter the popular lexicon as injuries or accidents. A corpus linguistics analysis reveals that references to "injury" in common usage pertained to physical, property, community, or economic harm, just as they did in 1912. Search of "Injury" from 1925, Corpus of Hist. Am. Eng., https://www.english-corpora.org/coha/ (last visited Nov. 14, 2022) (populating 27 source references). Popular uses of "accident" pertained to a single unexpected event, as contrasted from purposeful actions or disease. Search of "Accident" from 1925, Corpus of Hist. Am. Eng., https://www.english-corpora.org/coha/ (last visited Nov. 14, 2022) (populating 60 source references). Again, none of the identified popular uses involved trauma-induced mental injuries. It is therefore exceedingly difficult to conclude, as the dissent does, *infra* ¶66, that "1925 voters undoubtedly understood these terms as including mental injuries."

**¶43** Only eight years later in *Pierce*, the seminal 1933 case construing "injury by accident," the Court meticulously examined the meaning of the constitutional language. Using dictionary meaning, the Court, much as we have above, defined "injury" as "damage," and

"accident" as "an undesigned, sudden and unexpected event." 42 Ariz. at 442. The Court also focused on the preposition "by," noting that in isolation, an accident can be a cause or a result; but that when preceded by the preposition, it can only be a cause. *Id.* Thus, the Court concluded that eligibility for workers' compensation requires an unexpected event that caused an injury. *Id.* at 446.

**¶44** We are persuaded that the original, plain meaning of injury by accident requires more than the ordinary stresses presented by a specific job, but rather an unexpected event resulting in tangible physical harm. Therefore, §23-1043.01(B) supplements the constitutional requirement, as described the year prior to its adoption in *Sloss*.

**¶45** Matthews argues that the meaning of injury by accident, as reflected in several post-*Pierce* cases, has evolved over time. He cites a workers' compensation treatise for the proposition that "modern medical opinion" supports the view that "there really is no valid distinction between physical and 'nervous' injury," and that legal theory is "constantly adapting itself to accommodate new advances and knowledge in medical theory." *See* 4 Lex K. Larson & Thomas A. Robinson, *Larson's Workers' Compensation Law* §56.04 (2020).

**¶46** We do not hitch constitutional meaning to the evolving state of scientific art or "modern medical opinion." Such changes or advances are relevant to medical causation, which the parties agree is established in this case, but not to legal causation, which is defined here by the constitution. It may be that our organic law and statutes should be revised to reflect advances in medical understanding. The power to do so, however, resides exclusively in the people and their elected representatives, not the courts. Ariz. Const. art. 3; *see also Cavness*, 74 Ariz. at 30 ("Protection to workmen and their dependents is limited to injuries by accident arising out of and in the course of employment and we recognize that in no event must the workmen's compensation law be converted into a general health and accident coverage."). Article 18, section 8 is a mandate that the legislature enact a workers' compensation scheme, reposing in the legislature the discretion to decide its parameters beyond its core requirements. Section 23-1043.01(B) aligns with the constitutional directive to compensate some injuries caused by work-related accidents and reflects a permissible policy change expanding workers' compensation.

¶47　　　　In urging that we strike down § 23-1043.01(B), the dissent essentially argues that sometime over the past 110 years, article 18, section 8 was transformed from a limited workers' compensation mandate into one requiring general insurance coverage for whatever injuries or events might be shoehorned into the categories of injury and accident, construing those terms in the broadest possible way. Instead, the constitutional provision required the legislature to create a workers' compensation system, which it did in 1925 by expanding the classes of eligible beneficiaries while not expanding the scope of coverage. Many years later, following this Court's decision in *Sloss*, the legislature expanded the scope of coverage, within limits it deemed appropriate, by enacting § 23-1043.01(B). In other words, with the adoption of § 23-1043.01(B), mental stress caused by mental trauma was recognized as an "injury" in Arizona law. The legislature also provided therapy and counseling employment benefits to individuals employed in public safety, policing, and firefighting occupations. A.R.S. §§ 38-672, -673. These benefits supplement those mandated in 1912 and 1925. Therefore, we have no occasion to invalidate § 23-1043.01(B).

¶48　　　　Our decision does not leave workers unprotected against mental injuries. Quite the contrary. *See, e.g.*, *France*, 250 Ariz. at 488 ¶¶ 1– 2. However, the ALJ properly relied on extensive evidence that the traumatizing events Matthews experienced were a known and expected danger of the job. Accordingly, we affirm the ALJ's award determination.

¶49　　　　We do not here revisit past cases to the extent they are consistent with this opinion. We hold only that § 23-1043.01(B) does not violate article 18, section 8's limited mandate.

## II.　EQUAL PROTECTION

¶50　　　　Our federal and state constitutional guarantees of equal protection of the laws require the government to justify legal classifications that subject individuals to adverse treatment. *See, e.g.*, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (holding that equal protection "is essentially a direction that all persons similarly situated should be treated alike"). Matthews contends that § 23-1043.01(B) violates this guarantee by requiring workers who have suffered mental stress injuries to meet a higher standard of proof—i.e., that the injury was caused by "unexpected, unusual or extraordinary stress" — to qualify for workers' compensation. As noted above, *supra* ¶ 20, the constitutional definition of

injury by accident necessarily entails an unexpected event; thus, the differential treatment Matthews alleges does not appear here.

**¶51** Nor does the statute discriminate among workers who are subject to its terms. *Findley v. Indus. Comm'n*, 135 Ariz. 273, 276 (App. 1983). As the court of appeals noted in *Findley* "all members of a class, those with stress-related mental injuries or illnesses, are treated equally by the statute." *Id.*

**¶52** Even assuming that § 23-1043.01(B) does subject different classes of workers to different standards, those standards are based on a genuine difference among classes of workers. *See Cleburne*, 473 U.S. at 441–42 (recognizing that a "distinctive legislative response" is justified where "individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement"). The court of appeals held in *Findley* that "[g]iven the difficulty in proving the causal connection between mental illness and the work place, the legislature could constitutionally provide a more stringent proof classification for these types of injuries." 135 Ariz. at 276. We agree that § 23-1043.01(B) does not subject workers with stress-related injuries to unconstitutional discrimination.

## CONCLUSION

**¶53** Section 23-1043.01(B), which has governed compensation of stress-related workplace injuries for more than four decades, does not unconstitutionally limit recovery for such injuries. The challenged statute provides workers' compensation eligibility beyond that required by article 18, section 8, which is the legislature's prerogative.

**¶54** For the foregoing reasons, we affirm the decision of the court of appeals while vacating paragraphs 9–19 of its opinion and affirm the ALJ's award determination.

TIMMER, VCJ., concurring in part and dissenting in part.

**¶55**         I agree with my colleagues that A.R.S. § 23-1043.01(B) does not violate the equal protection guarantees of the state and federal constitutions. But because I interpret article 18, section 8 of the Arizona Constitution ("Section Eight") differently from the majority, I conclude § 23-1043.01(B) violates Section Eight. I therefore respectfully dissent from the majority's contrary position.

## I.         Defining "Injury" and "Personal Injury"

**¶56**         In interpreting Section Eight, "our primary goal is to effectuate the electorate's intent in adopting it" and in doing so, "we give the words their ordinary meaning, unless the context suggests a different one." *See State ex rel. Brnovich v. City of Phoenix*, 249 Ariz. 239, 244 ¶ 21 (2020). In my view, the majority misidentifies the ordinary meaning of "injury" and "personal injury" in Section Eight by defining those words as "physical damage." *See supra* ¶¶ 36-37.

**¶57**         First, nothing in Section Eight limits "injury" or "personal injury" to "physical damage." Dictionaries at the time voters ratified the constitution defined "injury" broadly.[3] The 1912 definition of "injury" cited by the majority includes "detriment" and "damage," both of which sufficiently describe a mental injury as well as a physical one. *See supra* ¶ 36. More pointedly, the 1909 Webster's New International Dictionary defined "injure" in part as "[t]o do harm to; to hurt; damage; impair; to hurt or wound, as the person; to impair the soundness of, as health." *Injure*, Webster's New International Dictionary (1909). Similarly, "injury" included "[d]amage or hurt done to or suffered by a person." *Injury*, Webster's New International Dictionary (1909). And before 1912, people had long recognized that mental impairments could be "injuries." *See, e.g., Injury*, Am. Dictionary of the Eng. Language, https://webstersdictionary1828.com/Dictionary/injury (last visited Nov. 15, 2022) (defining "injury" in part as "[t]hat which impairs the mental faculties."). Indeed, the 1912 Workman's Compulsory Compensation Act,

---

[3]Although voters ratified the constitution in December 1911, the majority focuses on the meaning of "injury" and "personal injury" in 1912, when Arizona became a state. For consistency, I likewise refer to 1912 as the pertinent ratification time frame.

enacted as required by Section Eight, recognized that workplace injuries could result in mental injuries. *See* Workman's Compulsory Compensation Act, 1912 Ariz. Sess. Laws ch. 14, § 13 (Spec. Sess.) (providing protective procedures for injured workers rendered "mentally incompetent").

**¶58** The majority is nevertheless persuaded to confine "injury" to physical trauma because a corpus linguistics review of the word in 1912 did not link it with "any type of illness or mental harm." *See supra* ¶ 36. The majority does not provide sufficient information about the corpus linguistics database to comfortably conclude it represents an adequate number and variety of publications to accurately reflect popular usage of "injury" in 1912. The fact that sixty written references to "injury" did not link the word to a mental injury is underwhelming, particularly as one would expect more references to such a common word. *Id.* And corpus linguistics does not reflect oral usage of "injury" in 1912. For these reasons, I place more weight on the dictionary definitions of the time as evidencing the ordinary meaning of "injury" and "personal injury."

**¶59** Regardless, my own search of the corpus linguistics database reveals writings reflecting public awareness that stressful events (an accident) could injure a person's mental health (an injury). *See* Search of "Mental Shock" from 1885 to 1917, Corpus of Hist. Am. Eng., https://www.english-corpora.org/coha/ (last visited Nov. 16, 2022) (populating thirteen source references, collectively). For example, in 1886 Oliver Wendell Holmes, Sr., father of the famous jurist, published "A Mortal Antipathy: First Opening of the New Portfolio," a novel acknowledging that a "sudden mental shock" may cause insanity and other mental injuries:

> [T]he records of our asylums could furnish many cases where insanity was caused by a sudden fright.
>
> More than this, hardly a year passes that we do not read of some person, a child commonly, killed outright by terror,— scared to death, literally. Sad cases they often are, in which, nothing but a surprise being intended, the shock has instantly arrested the movements on which life depends. If a mere instantaneous impression can produce effects like these, such an impression might of course be followed by consequences less fatal or formidable, but yet serious in their nature. If here

> and there a person is killed, as if by lightning, by a sudden startling sight or sound, there must be more numerous cases in which a terrible shock is produced by similar apparently insignificant causes,—a shock which falls short of overthrowing the reason and does not destroy life, yet leaves a lasting effect upon the subject of it.

Oliver Wendell Homes, *A Mortal Antipathy*, Project Gutenberg, https://www.gutenberg.org/files/2698/2698-h/2698-h.htm (Feb. 18, 2018) (Chapter VII).

**¶60** As another example, just a year after Arizona entered statehood, novelist Frances Hodgson Burnett, author of children's classics like "The Secret Garden" and "Little Lord Fauntleroy," published "T. Tembarom," which described a stranger who "slept a great deal and was very quiet." Frances Hodgson Burnett, *T. Tembarom*, Project Gutenberg (Feb. 1, 2001), https://www.gutenberg.org/cache/epub/2514/pg2514-images.html (Chapter VI). An examining doctor found no evidence of head trauma and yet noted the stranger's condition "was frequently the result of concussion of the brain, *sometimes of prolonged nervous strain or harrowing mental shock*." *Id*. (emphasis added); *see also* Frances Hodgson Burnett, *The Shuttle*, Project Gutenberg (Mar. 18, 2006), https://www.gutenberg.org/cache/epub/506/pg506-images.html (writing in 1907 that "[i]t could not be denied that Buttle received a *mental shock* which verged in its suddenness on being *almost a physical one*" (emphasis added)).

**¶61** "Injury" and "personal injury" are general terms with wide-ranging ordinary meanings, and we should apply those meanings within the framework of Section Eight. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) ("[I]n the end, general words are general words, and they must be given general effect."). Dictionaries and writings from the turn of last century support concluding that the ordinary meaning of "injury" and "personal injury" encompasses mental injuries. Section Eight's requirement that compensable injuries result "from any accident" on the job does not confine the meaning of "injury" to physical injury. Thus, in my view, a covered worker who incurs a mental injury from an on-the-job accident caused at least partially by "a

necessary risk or danger" of the employment or the failure of the employer to "exercise due care" or follow an employment law, is constitutionally entitled to workers' compensation. *See* Ariz. Const. art. 18, § 8.

¶62        Second, I disagree with the majority's focus on the meaning of "injury" and "personal injury" in 1912. The original version of Section Eight had narrower application and did not apply to law enforcement officers like Matthews. *See* Ariz. Const. art. 18, § 8 (1912) (requiring coverage for "such employments as the Legislature may determine to be especially dangerous"); 1912 Ariz. Sess. Laws ch. 14, § 3 (Spec. Sess.) (listing covered occupations but not including law enforcement). Thus, we should examine the language used when voters amended Section Eight to require compensation for a broader group of workers, including law enforcement officers. *See Norino Props., LLC v. Balsamo*, 265 A.3d 1109, 1125 (Md. Ct. Spec. App. 2021) (noting that "[a]mendments to a constitutional provision also 'bear on the proper construction of the provision as it currently exists,' and in such a situation, 'the intent of the amenders . . . may become paramount'" (quoting *State v. Phillips*, 179 A.3d 965, 969 (Md. 2018))).

¶63        That "injury" and "personal injury" include mental injuries comes into sharper focus when considering their meaning in 1925, when Section Eight was substantially amended. In 1925, the legislature repealed the laws originally enacted to carry out Section Eight's directive and replaced it with a more robust workers' compensation act. *See* 1925 Ariz. Sess. Laws ch. 83 (Reg. Sess.). Among other things, the new act created the industrial commission; established the state compensation fund; extended benefits to more workers and their dependents; included death benefits; and set wage percentages tied to disabilities to pay injured workers. *See id.* Simultaneously, the legislature called a special election for voters to amend Section Eight. *See id.* ch. 81–82. Unlike the 1912 version, the amended Section Eight also applied to publicly employed workers engaged in non-dangerous manual or mechanical labor; applied to privately employed workers as designated by the legislature; required payment of death benefits; declared that the wage percentages in the 1925 act could never be reduced or eliminated; provided for a worker's pre-injury election to accept compensation or instead sue the employer; and made other changes. *See* Ariz. Const. art. 18, § 8 (1925). The publicity pamphlet for the special election generally described the proposed amendments but did not separately identify the new language. *See* Ariz. Sec'y of State, 1925 Publicity

Pamphlet 516–17 (1925). Instead, voters were presented with the entire text of the proposed new Section Eight, which interwove the new and old language without distinction. *See id*. at 517–18.

¶64 Because the entirety of the new Section Eight was put before voters in 1925, and voters necessarily applied their understanding of "injury" and "personal injury" in deciding whether workers' compensation benefits should be extended to injuries suffered by public workers engaged in non-dangerous jobs and to designated private workers, the meaning of the language in 1925 is determinative. *See Norino Props.*, 265 A.3d at 1125.[4] The majority asserts that because "injury" and "personal injury" were used in Section Eight's amended version, the meaning assigned by 1912 voters controls. *See supra* ¶ 40. But common sense dictates that voters in 1925 gave their own meaning to "injury" and "personal injury" in deciding whether to extend benefits without considering how their 1912 counterparts defined the terms. *See Salt River Project Agric. Improvement & Power Dist. v. Apache Cnty.*, 172 Ariz. 337, 342 (1992) ("[N]o matter what result might be reached by applying constructs contained in the various canons of statutory and constitutional construction, common sense must also inform our decision."). Returning to the 1912 meaning of those words, assuming it differed from the 1925 meaning, would metaphorically pull the rug from beneath the 1925 voters' feet and should not be tolerated. Consequently, it would not be reasonable in those circumstances to ignore the ordinary meaning of "injury" and "personal injury" in 1925 and instead invoke their 1912 meanings.

¶65 As previously explained, I conclude that "injury" and "personal injury" included mental injuries in 1912. And by 1925, after soldiers had experienced "shell shock" from their experiences in World War I, people undoubtedly embraced this meaning. *See, e.g., Sjoholm v. Hercules Powder Co.*, 199 N.W. 603, 604–05 (Mich. 1924) (affirming workers' compensation award to widow of worker who suffered a "mental and

---

[4] The voters again amended Section Eight in 1980. *See* Ariz. Const. art. 18, § 8 (historical note). But that amendment did not concern the scope of "injury" or "personal injury," and interlineated language identified the new provisions for voters. *See* 1980 Ariz. Sess. Laws H.C.R. No. 2013 (2d Reg. Sess.). Thus, 1980 voters had no reason to ascribe new meaning to "injury" and "personal injury," and the meaning understood by 1925 voters remains determinative. *See Norino Props.*, 265 A.3d at 1125.

nervous condition" likened to "shell shock" caused by his presence during a massive explosion at his job site); F. G. Fowler & H. W. Fowler, The Pocket Oxford Dictionary of Current English 406 (4th ed. 1924) (defining "injury" as "wrong; harm, damage"). The majority ignores *Sjoholm*, a case directly on point concerning the issue here, and instead asserts that the dictionary definition of "injury" and common usage of the term remained unchanged since 1912. *See supra* ¶¶ 41–42.

**¶66** In sum, I disagree with the majority that "injury" and "personal injury" referred only to physical trauma in 1912. But even if that were so, 1925 voters undoubtedly understood these terms as including mental injuries, and the majority incorrectly ignores their viewpoint.

## II. Defining "Accident"

**¶67** Section Eight contains no language restricting "accident" to mean an "unexpected event," as the majority concludes. *See supra* ¶ 37. The only limitation is that "any accident" must be caused wholly or partially by (1) "a necessary risk or danger" of the job; or (2) a failure by the employer, an employee, or an agent to exercise due care or follow employment laws. *See* Ariz. Const. art. 18, § 8. This Court has consistently held that "any accident" in our workers' compensation laws includes an unexpected *resulting injury* and is compensable if the other criteria are met. *See, e.g., Fireman's Fund Ins. Co. v. Indus. Comm'n*, 119 Ariz. 51, 53 (1978) ("[A]n injury is caused by accident when the resulting injury is unexpected."); *Paulley v. Indus. Comm'n*, 91 Ariz. 266, 272 (1962) ("[W]e again announce that Arizona follows the English and now majority American view that an injury is caused 'by accident' when either the external cause or the resulting injury itself is unexpected or accidental. This construction of the phrase 'injury by accident' is most likely to effectuate . . . the evident purpose of the law that those covered by the act who are injured while engaged in industrial work are to be compensated.'" (second alteration in original) (quoting *Goodyear Aircraft Corp. v. Indus. Comm'n*, 62 Ariz. 398, 402 (1945))). Nothing in Section Eight suggests we should give "accident" in that provision a different, more restrictive meaning. Thus, giving the term its ordinary meaning, it encompasses unexpected injuries even when caused by expected events.

**¶68** The majority relies on the 1912 definition of "accident," which includes "mishap," a word that fairly describes injuries resulting from unexpected *and* expected events. *See* Laird & Lee's Webster's New

Standard American Dictionary of the English Language 726 (1911) (defining "mishap" as "[i]ll-luck; misfortune"). This definition also applied in 1925. *See* Fowler, *supra* ¶ 65, at 501 (defining "mishap" as "minor calamity"). Thus, for example, if a miner in 1913 had broken his hand while blasting rock, this would have constituted a "mishap" or "accident" even though the blast itself was an *expected* event. Although the miner's injury was unexpected, it would have been compensable as arising from the course of employment and caused by necessary risks or dangers of mining. *See* Ariz. Const. art. 18, § 8. This is just the sort of injury Section Eight was designed to address, yet the majority's restrictive definition would preclude compensation in this scenario.

¶69 The majority's additional restriction of "accident" to "singular" events is also incorrect, in my view, although this restriction does not affect the disposition here. *See supra* ¶ 37. This Court has consistently defined "accident" under the workers' compensation laws as including injuries gradually developing over time. *See, e.g., Martinez v. Indus. Comm'n*, 192 Ariz. 176, 181 ¶ 23 (1998) ("We do not accept the notion that one injury is compensable because it is caused by a single traumatic event which aggravates a pre-existing condition, but another injury is not compensable because employment activity that is repetitive gradually aggravates a pre-existing condition."). For example, a miner who breathed noxious fumes while working from 1913 through 1920 and developed a resulting lung disease would have suffered a "mishap" or "accident" even though the fumes gradually caused the disease. Although the lung disease was unexpected and developed gradually, it would have been compensable as arising from the course of employment and caused by necessary risks or dangers of mining. *See* Ariz. Const. art. 18, § 8. Again, this is just the sort of injury Section Eight was designed to address, yet the majority's restrictive definition would preclude compensation in this scenario.

¶70 In sum, I conclude that an "accident" in Section Eight means an unexpected event or an unexpected injury. I further conclude that job conditions can constitute an "accident" when they gradually cause an injury.

### III.    Application Here

**¶71**        Because "injury" and "personal injury" in Section Eight encompass mental injuries, and "accident" in that provision includes unexpected injuries, the legislature is prohibited from excluding coverage of mental injuries arising from job-related events "unless some unexpected, unusual or extraordinary stress related to the employment or some physical injury related to the employment was a substantial contributing cause." *See* § 23-1043.01(B). This limitation impermissibly redefines legal causation as set forth in Section Eight. *See Grammatico v. Indus. Comm'n*, 211 Ariz. 67, 72 ¶ 23 (2005) (declaring a statute unconstitutional that altered Section Eight's legal causation requirement by excluding compensation for job accidents "if alcohol or illegal drug use contributed even slightly to the accident" caused by a necessary risk or danger of employment).[5]

**¶72**        The majority complains that this conclusion transforms Section Eight into a "general insurance coverage" provision that was never intended by voters. *See supra* ¶ 47. That may be so. But voters' unexpressed intentions are neither here nor there. Our role is to identify the meaning of the language used in Section Eight and apply it. *See* Randy E. Barnett, *An Originalism for Nonoriginalists*, 45 Loy. L. Rev. 611, 622 (1999) (criticizing some originalists for "still search[ing] for how the relevant generation of ratifiers expected or intended their textual handiwork would be applied to specific cases"). Curtailment of Section Eight should be through amendment of that provision at the ballot box.

**¶73**        For all these reasons, I would set aside the Industrial Commission's decision and order.

---

[5]  Section 23-1043.01(B) also excludes compensation for mental injuries caused by "some physical injury related to the employment" unless the physical injury "was a substantial contributing cause of the mental injury, illness or condition." Whether this restriction concerns medical causation, and is therefore permissible under Section Eight, is not before us. *See Grammatico*, 211 Ariz. at 71-72 ¶ 20 (recognizing that Section Eight "does not limit the legislature's power to enact legislation affecting medical causation").